IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

WILLIAM S.,[1]           )
                         )
        Plaintiff,       )
                         )
vs.                      )     Case No. 17-cv-1206-JPG
                         )
COMMISSIONER OF SOCIAL SECURITY, )
                         )
        Defendant.       )
                         )

# MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB in September 2013 and for SSI in March 2016. In both applications, he alleged that he became disabled as of as of February 10, 2012. At the evidentiary hearing, the alleged onset date was amended to April 20, 2013. (Tr. 37.) After holding an evidentiary hearing, ALJ Thomas Auble denied the applications on October 28, 2016. (Tr. 16-28.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1.) Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issue Raised by Plaintiff

Plaintiff raises only one issue, that the ALJ erred in weighing the opinions of the state agency consultants and of the consultative examiner.

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order to protect her privacy. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

## Applicable Legal Standards

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[2] The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4)

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423 *et seq.* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c *et seq.* and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, which details medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

**The Decision of the ALJ**

ALJ Auble followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the amended alleged onset date and that he was insured for DIB only through June 30, 2014.[3] He found that plaintiff had severe impairments of anxiety disorder and mood disorder.

---

[3] The date last insured is relevant only to the claim for DIB.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels, with the following limitations:

> the claimant can have no exposure to hazardous machinery; is limited to work that involves only one or two step tasks; can perform work in a low stress job, defined as having only occasional decision making and only occasional changes in work setting; can perform work with no production quotas (e.g. no strict production standard and no rigid production pace such as an automated line that the worker could not control); could have only occasional interactions with the general public; and could have only occasionally [sic] interactions with coworkers and supervisors.

(Tr. 21.)

Based on the testimony of a vocational expert (VE), the ALJ concluded that plaintiff could not do his past work as a carpenter, but he was not disabled because he could do other jobs that existed in significant numbers in the national economy.

### **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the point raised by plaintiff.

**1. Prior Application**

A prior application for disability benefits was denied by an ALJ on April 19, 2013. (Tr. 78-87.)

**2. Agency Forms**

Plaintiff was born in 1977. He was almost 36 years old on the alleged date of disability. (Tr. 400.) He had worked as a carpenter from 2006 to 2010. (Tr. 405.)

**3. Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in May 2016. (Tr. 35.)

Counsel amended the alleged onset date to April 20, 2013, the day after the prior application for disability benefits was denied. (Tr. 37.)

Plaintiff last worked in December 2010. (Tr. 43.)

Plaintiff testified that he was prescribed Xanax for anxiety, and he became addicted to it around December 2010. He stopped taking Xanax and has felt "almost post-traumatic stress disorder" since then. (Tr. 44-45.) The ALJ asked him about his present condition. He testified that he is "very tense." He has difficulty getting out of the house. Being around people caused him anxiety. The previous day, he cried in bed for four hours after he woke up. He said he was better than he had been in 2010, but he could not work because he was not dependable and would miss too much work. (Tr. 49-53.) He had not talked to any of his friends in over six years. He had become reclusive. (Tr. 58.)

A VE also testified. The ALJ asked him a hypothetical question which corresponded to the ultimate RFC findings. The VE testified that this person could not do plaintiff's past work as a carpenter, but there were other jobs that he could do. If he missed more than one day a month, competitive work would be precluded. If he were also limited to no contact with the public or coworkers and only superficial contact with supervisors, there would be no unskilled work that he could do. (Tr. 60-63.)

### 3. Medical Records

Plaintiff's primary care physician was Dr. Michael Adams. In October 2012, a nurse practitioner in Dr. Adams' office noted that plaintiff had an anxiety disorder and was scheduled to see a psychiatrist. Plaintiff had weaned himself off Lexapro because of the cost, but it made his anxiety worse. He was taking Remeron. She added a prescription for Prozac. (Tr. 703-04.)

Plaintiff began seeing Dr. Mark Freeman, a psychiatrist, in late October 2012. He saw him twice in 2012 and seven times in 2013. (Tr. 576-617.) At the first visit, Dr. Freeman noted that plaintiff had a lifelong history of anxiety and social anxiety. After he stopped taking Xanax, his relationships were gone, he could not work, and it was difficult for him to leave the house. On exam, his motor activity was restless, and his mood and affect were anxious. Dr. Freeman told him to continue taking Prozac and added Fluoxetine and Mirtazapine. (Tr. 576-79.) The dosage of Prozac was increased in December 2012, and Remeron was added. (Tr. 582.) The dosage of Prozac was decreased in February 2013 because he felt a "drugged sensation." (Tr. 586.)

In May 2013, Dr. Freeman noted some improvement in that plaintiff had been able to go to the race track with a friend and was able to be home alone at his mother's house. However, he still struggled with concentration. He had less "constant impending panic" but it still came in waves. He had "some clear benefit" with Prozac, but still had "some rough days." His mood and affect were anxious. In July, he had neck aching and stiffness in response to anxiety when around other people, and his concentration was still unreliable. His mood and affect were anxious. Dr. Freeman prescribed Buspar to "reduce anxiety experience" and discontinued Remeron. Buspar caused headaches, panicky feelings, and racing thoughts, so the dosage was decreased two weeks later. On the lower dose, plaintiff had anxiety and depression, so Dr. Freeman added Abilify. However, plaintiff was unable to afford the co-pay for Abilify, so Dr. Freeman prescribed Lamictal. (Tr. 590-601.)

At a visit in August 2013, plaintiff told Dr. Freeman that reducing the dosage of Buspar helped, but he still had a lot of anxiety. He had periods where he was "confused." He was "[o]n the edge of difficulty leaving the house." His mood and affect were again anxious. Dr. Freeman

discontinued Buspar and instructed plaintiff to gradually increase the dosage of Lamictal. The next month, plaintiff reported that he felt tense and worse with Lamictal. He was avoiding leaving the house. His mood was anxious, and his affect was anxious and helpless. Lamictal was discontinued and the dosage of Prozac was increased because "it had clearly allowed him to more easily leave the house." He was started on Remeron again. (Tr. 601-07.)

Dr. Freeman noted some improvement at the next visit in October 2013. He was able to drive himself to the office. He had moved his electronics into the living room to reduce the time he spent in the bedroom. He had been able to go with a friend to get corn stalks for a party. However, he still became panicky if he was frustrated, had a complex problem, or felt pressured or flustered. (Tr. 609-12.) In December, plaintiff reported that "some uncomfortable chest sensations" had come back a few weeks after the last visit. He got overwhelmed with any stress. He had not had a full-blown panic attack in recent days, but "threatened panic occurs often." His mood was less anxious, and his affect was anxious. Dr. Freeman increased the dosage of Prozac from 20 mg to 40 mg. (Tr. 615-17.)

When plaintiff returned in February 2014, he had gotten on Medicaid. Dr. Freeman was not a Medicaid provider, so plaintiff had to find a different mental health care provider. (Tr. 618.)

Plaintiff began receiving care from Wellspring Resources, later known as Centerstone, in February 2014. He was seen by a both a counselor and a psychiatrist there, and was seen through March 2016. (Tr. 622-63, 711-878.) At the initial assessment, he reported that he had some depression which came and went. His anxiety caused him to have a racing heart, numbness and tingling in his fingers, and a feeling that he could not breathe. He did not leave the house much. (Tr. 628.)

Plaintiff was seen by a psychiatrist at Centerstone roughly once a month. Two different psychiatrists saw him. His medications were adjusted and changed somewhat to treat his anxiety. Both doctors generally noted on exam that plaintiff's insight and judgment were normal, his memory was intact, he was oriented, and he was able to maintain focus during the interview. Psychomotor behavior, eye contact, and speech/language were all normal. His affect and mood were anxious and worried. Both doctors checked boxes indicating that he was experiencing "some symptom relief" or "major symptom relief" from his medications and that he showed improvement in progress towards his goals. His diagnoses were mood disorder and anxiety disorder. (Tr. 651-63, 857-58, 865-66, 875-76.) At the last two visits (December 2015 and February 2016), the doctor noted that plaintiff's appearance and eye contact were good; affect was appropriate; mood was euthymic (normal); speech was normal; thought process was logical with an unremarkable stream of thought; concentration was fair; and memory was intact. His status was "unchanged" in December 2015. The doctor rated him as "improved" in February 2016. (Tr. 865-66, 875-76.)

Plaintiff was also seen by a counselor at Centerstone. (Tr. 771-840, 859-60.) The counselor usually noted on exam that plaintiff's mood/affect were appropriate, he was calm, and he was oriented. He had no thought of harming himself or others. One exception is that he was angry and depressed in August 2014; he was "pissed" because the psychiatrist would not fill out paperwork for his disability application. (Tr. 781.) A week later, plaintiff's mood/affect were appropriate, he was calm, and he was oriented to person and situation. (Tr. 784.) In September 2014, he was anxious and hyperactive (Tr. 787), but, two weeks later, his mood/affect were appropriate, he was calm, and he was oriented to person and situation. He said that things were

going well and nothing big was causing him undue anxiety. (Tr. 790-91.) In October 2014, he reported that his grandmother passed away and he helped care for other family members' needs. He said this made him "feel like an adult again" and he needed to stop isolating and thinking of himself so much. (Tr. 797.) In January 2015, he said his coping skills were helping him with his anxiety. (Tr. 803.) Two weeks later, he said he was going out more and isolating less. He hadn't had any panic attacks or extreme anxiety lately. (Tr. 806.) In early February 2015, he said that he was not having many panic attacks lately, just generalized anxiety with a very occasional panic attack that he was able to control. (Tr. 809.) In April 2015, he had "been doing good as of late." He did have some anger issues with his family wanting him to move furniture. He said he felt he could not "be me" around them. The counselor tried to clarify his meaning and concluded, "Eventually it came down to smoking pot." Plaintiff felt he would be judged if he smoked pot around his family. The counselor reminded him that he had said he was going to stop smoking pot because he thought that smoking pot had caused some panic attacks. (Tr. 818.) In May 2015, plaintiff said he wanted to give up smoking pot for a while "to gauge better how he is handling his anxiety." (Tr. 825.) At a yearly assessment in January 2016, the counselor noted that plaintiff "has worked well through anxiety to the point where he has minimized the number of panic attacks but still has a lot of generalized anxiety." (Tr. 841.)

  4.  **State Agency Consultants' Assessment**

In December 2013, state agency consultant Terry Travis, M.D., assessed plaintiff's mental RFC based on a review of the record. (Tr. 95-99.) Dr. Travis reviewed records from Dr. Freeman dated October 29, 2012, and October 29, 2013; he noted that, on the latter date, plaintiff was less anxious and his mental status exam was normal. In the "psychiatric review technique"

section of his report, Dr. Travis found that plaintiff had moderate restrictions of daily living, marked difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace.[4] In the mental RFC assessment section, Dr. Travis found that plaintiff had no limitation in ability to carry out short and simple instructions, and was not significantly limited in ability to carry out detailed instructions. He rated plaintiff as markedly limited in a number of areas:

- ability to maintain attention and concentration for extended periods;

- ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- ability to work in coordination with or in proximity to others without being distracted by them;

- ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- ability to interact appropriately with the general public;

- ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

- ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

(Tr. 97-98.) Dr. Travis concluded that plaintiff was "unable to do 1-2 step tasks in a routine work setting due to marked problems with persistence, concentration and interacting with others." (Tr. 99.)

In October 2014, a second consultant, Thomas Low, Ph.D., reviewed the record and rated plaintiff's mental RFC. (Tr. 108-12.) His findings in the psychiatric review technique were the

---

[4] The psychiatric review technique is described in 20 C.F.R. § 404.1520a.

same as Dr. Travis's. In the mental RFC section, he agreed with Dr. Travis that plaintiff had marked limitations in social functioning, including interacting with the public and getting along with coworkers. However, he found moderate, not marked, limitations in maintaining concentration and persistence, including ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination with or in proximity to others without being distracted by them; and ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In contrast to Dr. Travis, Dr. Low concluded that plaintiff was "unable to do *complex* tasks in a routine work setting due to marked problems with persistence, concentration and interacting with others." (Tr. 112.)

### 5. Consultative Psychological Examination

On August 30, 2016, Stephen Hardy, Ph.D., performed a consultative examination of plaintiff at the request of the agency. (Tr. 879-85.) Dr. Hardy was furnished with records from Dr. Freeman dated August 2013 through December 2013. Dr. Hardy described plaintiff as alert, attentive, and cooperative throughout the exam. Dr. Hardy found that plaintiff was oriented, with logical and coherent thought processes. His speech was spontaneous, and articulation was clear. Immediate memory was reasonably intact, but insight and judgment were not satisfactory. Dr. Hardy concluded that plaintiff had no limitations in ability to understand and remember simple instructions, carry out simple instructions, and to make simple work-related decisions. He was moderately limited in ability to carry out complex instructions and in ability to interact with the public, supervisors, and coworkers. He was also moderately limited in ability to respond to usual

work situations and to changes in the work setting.

**Analysis**

Plaintiff takes issue with the weight afforded to the opinions of the state agency consultants and of the consultative examiner.

The ALJ afforded "little weight" to the opinions of Drs. Travis and Low because they did not examine plaintiff and their opinions were not consistent with the record as a whole. In addition, the opinions were "somewhat internally inconsistent and contradictory." The consultative exam by Dr. Hardy was ordered because of the last reason. (Tr. 25.)

Plaintiff argues that the ALJ erred in giving little weight to the opinions of Drs. Travis and Low because they reviewed more medical records that Dr. Hardy did and because they are state agency consultants who are experts in evaluating medical issues in disability claims, citing Social Security Ruling 17-2p, 2017 WL 3928306 (Mar. 27, 2017). He also argues that the ALJ did not identify how their opinions were inconsistent with the record and did not address their opinions in detail.

The ALJ was, of course, not required to adopt the opinion of Dr. Travis or Dr. Low. Rather, he was required to weigh them as the opinions of nonexamining sources, per the version of the applicable regulation in effect at the time of his decision. 20 C.F.R. § 404.1527 (Aug. 24. 2012).[5] The regulation requires the ALJ to consider six factors: examining relationship; treatment relationship; supportability; consistency; specialization; and any other factor that tends to support or contradict the opinion. As to the first factor, the agency generally gives more weight to the opinion of a doctor who has examined the claimant. The fourth factor, consistency, refers

---

[5] 20 C.F.R § 404.1527 was revised effective March 27, 2017. References herein will be to the version in effect at the time of the ALJ's decision.

to consistency of the opinion with the record as a whole. 20 C.F.R. § 404.1527(c).

Although the ALJ's discussion could have been fuller, the Court concludes that he did not err in weighing the state agency reviewers' opinions. First, they did not examine plaintiff, but only reviewed records. Plaintiff argues that they reviewed more records than Dr. Hardy did. However, that does not mean much. Dr. Travis gave his opinion in December 2013, and Dr. Low gave his in July 2014. Neither doctor reviewed all the records, and most of plaintiff's treatment at Centerstone occurred after their review. Most importantly, as the ALJ noted, their opinions were not consistent with the record as a whole and were contradictory.

Plaintiff argues that the ALJ did not specify how the opinions were inconsistent with the record, but the ALJ's decision must be read as a whole. *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015). In the section of the decision preceding the weighing of the opinions, the ALJ reviewed the medical evidence and concluded that it showed that plaintiff improved with medication and that records from 2015 and 2016 showed that he had good, ongoing control of his symptoms. *See* Tr. 22-24. Thus, the treatment records were not consistent with the limitations assigned by Drs. Travis and Low.

Further, as the ALJ noted, the two opinions contradicted each other. Plaintiff incorrectly states that Dr. Low assigned the same limitations as Dr. Travis. *See* Doc. 12, p. 7. As was noted above, in the RFC assessment, Dr. Low assigned moderate, not marked, limitations in maintaining concentration and persistence. In addition, the reviewers' bottom-line conclusion conflicted in that Dr. Travis said plaintiff was unable to do even 1-2 step tasks in a routine work setting, but Dr. Low said he was unable to do *complex* tasks in a routine work setting. Plaintiff's argument ignores the differences in the two opinions.

The ALJ afforded great weight to Dr. Hardy's opinion because Dr. Hardy examined plaintiff, his "check list" form was accompanied by a three-page narrative explanation, and his opinion was well-supported by the record. (Tr. 25.)

Plaintiff argues that Dr. Hardy was furnished with only a small part of the record, and that those "handpicked records suggested an improvement in the claimant's mental state." This criticism has no merit. Plaintiff characterizes the records as suggesting improvement because they contain a GAF assessment of 50 in August 2013 and a GAF assessment of 60 in December 2013. However, the next GAF assessment was only 48; Dr. Hardy was not given records postdating December 2013 and so did not see the assessment of 48. See, Doc. 12, p. 5.

As the ALJ explained. GAF assessments are subjective and are of limited value in assessing a person's ability to do basic work activities. (Tr. 25.) In fact, the American Psychiatric Association abandoned the GAF scale in the 5th edition of its *Diagnostic and Statistical Manual of Mental Disorders*, published in 2013, because of "its conceptual lack of clarity . . . and questionable psychometrics." *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014). More to the point, plaintiff's argument relies on an isolated assessment not done by a doctor. The last visit with Dr. Freeman was in December 2013, and Dr. Freeman assessed his GAF at 60. The 48 score was assessed at the initial intake at Wellspring in February 2014 and was done by a staff person who was not a doctor. (Tr. 615-16.) At the first visit with a psychiatrist at Wellspring in April 2014, the doctor rated plaintiff's GAF at 60. (Tr. 655.) Thereafter, the doctors at Wellspring/Centerstone consistently rated plaintiff's GAF at 60. The Court cannot conclude that the portion of the records that was given to Dr. Hardy unfairly represented plaintiff's condition. Further, plaintiff's argument misconstrues the role that Dr.

Hardy was playing. His task was to evaluate plaintiff's RFC based on his examination, not based on a review of the record.

Plaintiff also argues that the ALJ did not explain how the record was consistent with Dr. Hardy's opinion. As was explained above, the decision must be read as a whole, and the ALJ's review of the treatment records which demonstrated good control of plaintiff's symptoms was consistent with Dr. Hardy's opinion.

Lastly, plaintiff criticizes Dr. Hardy's report because it was a check list form, but ignores the fact that this criticism applies equally to the forms completed by Drs. Travis and Low. He disputes the ALJ's statement that Dr. Hardy provided a three-page narrative explanation of his opinion. Plaintiff's point here is belied by the record. See narrative section of Dr. Hardy's report at Tr. 879-82.

The Court notes that plaintiff does not argue that the ALJ's RFC assessment does not adequately reflect the limitations assigned by Dr. Hardy.

Plaintiff has not identified any errors requiring remand or demonstrated that the ALJ's decision was not supported by substantial evidence. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Auble committed no errors of law, and that his findings are supported by substantial evidence.

Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's applications for disability benefits is **AFFIRMED**.

The Clerk of Court is **DIRECTED** to enter judgment in favor of defendant.

**IT IS SO ORDERED.**
**DATE:   February 6, 2019**

>                                    s/ J. Phil Gilbert
>                                    **J. PHIL GILBERT**
>                                    **DISTRICT JUDGE**